## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KIRSTYN PAIGE BASHAW,**

      **Plaintiff,**           :

**v.**                            **Case No. 2:23-cv-00291**
                                    **Judge Sarah D. Morrison**
                                    **Magistrate Judge Chelsey M.**
**MAJESTIC CARE OF**             **Vascura**
**WHITEHALL, LLC,**            :

      **Defendant.**

### <u>OPINION AND ORDER</u>

This matter is before the Court on the Motion for Summary Judgment filed by Majestic Care of Whitehall, LLC (Mot., ECF No. 21). Kirstyn Paige Bashaw responded (Resp., ECF No. 30), and Majestic Care filed a Reply (Reply, ECF No. 34). This matter is now ripe for consideration. For the reasons set forth below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

Majestic Care operates a skilled nursing home and residential facility in Whitehall, Ohio. (Answer, ECF No. 16, ¶ 13.) Ms. Bashaw worked as the Director of Social Services at Majestic Care from November 9, 2021, until she was terminated on March 9, 2022. (Resp., Ex. D, ECF No. 30-4, PAGEID # 893.) In this role, she was expected to "direct and manage[] the day-to-day operations of the Social Service department in accordance with current federal and state regulations in addition to the community policy." (Mot., Ex. A, ECF No. 21-1, PAGEID # 244.)

1

She was primarily responsible for completing assessments (behavioral, mental health, community need) for incoming residents; responding to and assisting with resident emergencies; and addressing communications or requests from residents' families. (*Id.*; Mot., Ex. B ("Bashaw Dep. I"), ECF No. 25-1, 18:21–21:16.) Ms. Bashaw also participated in interdisciplinary care team meetings and other group meetings, including a "stand-up" or "morning meeting" at the start of each day and a "stand-down" meeting at the end of the day. (Bashaw Dep. I, 24:23–25:12.) After her first week, she was supervised by Edward Beatrice, Majestic Care's Executive Director. (*Id.* 31:16-19; Resp., Ex. D, PAGEID # 893.)

### A. Ms. Bashaw grows concerned about resident care and Mr. Beatrice's conduct.

Not long after starting at Majestic Care, Ms. Bashaw became concerned about the quality of resident care. (*See, e.g.*, Bashaw Dep. I, 45:12–52:13, 87:24–88:19.) She began to document instances of what she believed to be substandard care—including "inappropriate behaver or actions toward patients" and nurses "not attending to their duties"—in her personal notebook, an excel spreadsheet, and her new-hire orientation packet. (*Id.*, 34:14–35:3, 85:12-20.) Though she did not share these materials with anyone at Majestic Care, she did voice her concerns to other employees, including Mr. Beatrice. (*Id.*, 47:11-17, 57:1-5, 63:19–64:3, 89:12-16, 94:15–95:2, 95:8–96:3, 101:18–102:2; Mot., Ex. D ("Beatrice Dep."), ECF No. 25-4, 67:5-8.) Over time, Ms. Bashaw's complaints increased in frequency; in mid- to late-February 2022, she raised concerns about a plethora of different matters during daily meetings and separately with Mr. Beatrice and others. (Bashaw Dep. I, 53:22–

2

56:8; Beatrice Dep., 72:3–73:6.)

Ms. Bashaw was particularly troubled by one nurse's treatment of a resident who had a wound on her leg ("Resident A"). (Bashaw Dep. I, 61:8–62:12.) Ms. Bashaw observed the nurse's failure to properly attend to Resident A's wound and believed that this neglect was the reason that Resident A's leg was later amputated. (*Id.*, 53:21–54:5.)

In addition to resident care, Ms. Bashaw was bothered by some of Mr. Beatrice's conduct, which she interpreted as "racially or socioeconomically inappropriate or offensive." (Bashaw Dep. I, 32:22–33:18.) Ms. Bashaw felt that Mr. Beatrice was "not very sensitive to cultural factors." (*Id.,* 32:15-21.) As with her concerns about residents, Ms. Bashaw personally documented Mr. Beatrice's actions. (*Id.*, 40:15–41:4.) Some of the behaviors that Ms. Bashaw thought were inappropriate included Mr. Beatrice's use of the words "ghetto" and "bougie" to refer to the nurses of color on staff; his comments about certain Muslim staff not celebrating Easter; his references to actor Will Smith's biography; his remarks about "beat[ing] up" a Black nurse "in a dark alley"; and his comments about the laziness of the primarily Hispanic and Black housekeeping staff. (Mot., Ex. B ("Bashaw Dep. II"), ECF No. 27-4, 14:19–21:8, 23:8-23, 24:15–25:20, 26:9–28:7.)

Ms. Bashaw also noted instances of Mr. Beatrice "being very discriminatory towards women." (Bashaw Dep. II, 29:16-25.) Ms. Bashaw considered Mr. Beatrice to be "dismissive," "distrustful," "outwardly rude," and "skeptical of women." (*Id.*, 31:10–32:20, 34:11–36:12.) She believed that he would leave women out of

conversations and decisions in favor of working with men. (*Id.*, 30:11–33:15; 45:8–46:21, 46:3-11.) Finally, Ms. Bashaw became aware that on one occasion, Mr. Beatrice walked into a female manager's office while she was pumping breast milk. (*Id.*, 44:19–48:17; *see also* Resp., Ex. C ("Hopson Decl."), ECF No. 30-3, ¶ 16.)

### B. Ms. Bashaw expresses concerns to Majestic Care's Human Resources Director.

On March 1, 2022, Ms. Bashaw met with Chandler Kuhn (the facility's Human Resources director) to report her concerns about resident care and Mr. Beatrice's "culturally insensitive" behavior. (Bashaw Dep. I, 33:21–36:14; Bashaw Dep. II, 55:2–59:24; Mot., Ex. G ("Kuhn Notes"), ECF No. 21-7, PAGEID # 257.) This was not the first time Ms. Bashaw had talked to Mr. Kuhn about her complaints. (Bashaw Dep. I, 44:5–46:21, 51:9-20.) During this particular meeting, Ms. Bashaw told Mr. Kuhn that she and others were gathering information and would be submitting a formal complaint to Lighthouse, Majestic Care's corporate compliance hotline.[1] (*Id.*, 43:2-20; Mot., Ex. F ("Nieset Dep."), ECF No. 25-5, 18:1–19:3.) She informed Mr. Kuhn that if Mr. Beatrice "was not released, then most, if not all, of us would be putting in our notices." (Bashaw Dep. I, 43:12-18; Kuhn Notes, PAGEID # 257.)

After the meeting, Mr. Kuhn notified Mr. Beatrice of Ms. Bashaw's report and called and provided notes to Simone Wimberly, Majestic Care's regional Human Resources director. (Beatrice Dep., 78:3-14; Kuhn Notes, PAGEID # 257; Mot., Ex. K

---

[1] Ms. Bashaw ultimately never made any reports to Lighthouse during or after her employment with Majestic Care. (Bashaw Dep. I, 44:1-3.)

("Wimberly Notes"), ECF No. 21-11, PAGEID # 265.) Ms. Wimberly then began to investigate Ms. Bashaw's allegations of discrimination and harassment against Mr. Beatrice. (Wimberly Notes, PAGEID # 265.)

### C. Ms. Bashaw voices concerns about Resident B's re-admission.

A few days before her March 1 meeting with Mr. Kuhn, Ms. Bashaw received a call from an employee at Mount Carmel Behavioral Health about a Majestic Care resident who had been discharged to Mount Carmel for psychiatric care ("Resident B"). (Bashaw Dep. I, 72:24–74:21; Mot., Ex. E, ECF No. 21-5, PAGEID # 253.) The Mount Carmel employee notified her that Resident B was ready to be re-admitted to Majestic Care. (Bashaw Dep. I, 72:24–74:21.) The parties dispute the employee's identity and what Ms. Bashaw told her on the call,[2] though they agree that Ms. Bashaw did not have authority to make final re-admission decisions. (Bashaw Dep. I, 22:11–23:21, 28:15–29:12, 75:13-19; Beatrice Dep., 19:15-23.) Regardless, shortly after Ms. Bashaw spoke with the employee, Mount Carmel's clinical director contacted Mr. Beatrice and threatened to report Majestic Care to the state health department because she was under the impression that Majestic Care had refused to accept Resident B. (Mot., Ex. E, PAGEID # 253; Beatrice Dep., 102:1-14.) Mr. Beatrice assured the clinical director that Majestic Care would accept Resident B; in

---

[2] Majestic Care argues that Ms. Bashaw affirmatively told Mount Carmel's clinical director that Majestic Care would not be re-admitting Resident B. (Beatrice Dep., 102:3-18.) Conversely, Ms. Bashaw insists that she spoke with a social worker at Mount Carmel, not the clinical director, and that she "recommended that [Resident B] not return. But [she] did not say that he wasn't allowed." (Bashaw Dep. I, 72:24–74:13.)

fact, Resident B was re-admitted shortly thereafter and placed in the memory care unit. (Mot., Ex. E, PAGEID # 253; Mot., Ex. L ("Recording 2"), ECF No. 21-12.)

Ms. Bashaw expressed her disagreement with Resident B's re-admission to Mr. Beatrice and others at the stand-up meeting on March 2. (Recording 2.) She felt Resident B should not be kept on a locked unit without a proper diagnosis and that doing so amounted to holding him against his will when he was his own legal guardian. (*Id.*) Mr. Beatrice responded that the facility's medical director had recommended this plan, so it was "the solution that we have right now." (*Id.*) Believing that the decision was unethical and unsafe, Ms. Bashaw left the meeting and left the facility. (Bashaw Dep. I, 80:11-24.) Unbeknownst to most of the meeting attendees, Ms. Bashaw had recorded the discussion using her cell phone. (Bashaw Dep. I, 77:6-7, 78:5-8, 81:4-9; *see also* Recording 2.)

### D.  Majestic Care conducts an investigation and terminates Ms. Bashaw.

Following the March 2 stand-up meeting, Melany Nieset (Majestic Care's VP of Human Resources) became aware of the incident regarding Resident B. (Nieset Dep., 29:2-19.) She called Ms. Bashaw and instructed her not to return to work while Majestic Care gathered further information. (*Id.*, 30:2–31:6.) As part of her investigation, Ms. Nieset spoke with Mr. Beatrice and connected with Ms. Wimberly, who was interviewing Ms. Bashaw's coworkers as part of her own investigation. (*Id.*, 29:2-19; Wimberly Notes, PAGEID # 265.)

On March 3, Ms. Nieset and Ms. Wimberly called Ms. Bashaw to discuss the issue with Resident B and her complaints against Mr. Beatrice. (Mot., Ex. M

6

("Recording 3"), ECF No. 21-13, *generally*; Wimberly Notes, PAGEID # 265.) Ms. Bashaw detailed her concerns but said that she loved her job, though she did not enjoy the "working environment." (Recording 3.) Ms. Nieset and Ms. Wimberly then brought up Ms. Bashaw's "performance issues." (*Id.*) Their primary issue related to Ms. Bashaw's attendance—records show that Ms. Bashaw was tardy[3] 11 times and had two-and-a-half unexcused absences over the course of approximately six weeks. (Mot., Ex. C, ECF No. 21-3, PAGEID # 249.) Ms. Bashaw, who was not required to track her time and who had not received any corrective action with respect to attendance, denied the metrics. (Recording 3; Beatrice Dep., 35:21–36:2, 38:14–39:4, 45:14-21.) During their call, Ms. Nieset and Ms. Wimberly became aware that Ms. Bashaw was surreptitiously recording the conversation. (Recording 3.)

Less than a week after this call, Majestic Care terminated Ms. Bashaw. (Wimberly Notes, PAGEID # 265.) Ms. Bashaw believes Majestic Care retaliated against her because of her complaints about resident care and Mr. Beatrice's harassment. (Bashaw Dep. I, 108:3-11.) In December 2022, Ms. Bashaw filed a charge with the EEOC. (Bashaw Dep. II, 10:3–11:24.)

## II.    PROCEDURAL BACKGROUND

Ms. Bashaw originally commenced this action against Majestic Care in state court. (Not. Removal, ECF No. 1, ¶ 1.) She asserted two causes of action: a claim for

---

[3] Majestic Care considered an employee "late" if she did not arrive on time for the morning meeting held at 9:00AM and "tardy" if she was more than 15 minutes late to the meeting. (Beatrice Dep., 41:15–42:11.)

retaliatory termination under Ohio Rev. Code § 3721.24 (Count I)[4] and a claim in the alternative for wrongful termination in violation of public policy (Count II). (Compl., ECF No. 2, ¶¶ 49–63.) Majestic Care answered and moved to dismiss Count II. (Not. Removal, ¶ 2.) The parties briefed the motion, but before the state court issued a decision, Ms. Bashaw filed an Amended Complaint in which she added a claim for retaliation under Title VII of the Civil Rights Act of 1964 (Count III) and a claim for retaliation under Ohio Rev. Code Chapter 4112 (Count IV). (Am. Compl., ECF No. 7, ¶¶ 70–81.)

Majestic Care timely removed the case to federal court. (Not. Removal, *generally*.) The Court ruled on Majestic Care's then-pending motion and dismissed Count II of the Amended Complaint. (ECF No. 17, PAGEID # 204.) Majestic Care now moves for summary judgment on the remaining three claims.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*,

---

[4] Ohio Rev. Code § 3721.24(A) provides in relevant part that "[n]o person or government entity shall retaliate against an employee … who, in good faith, makes a report of suspected abuse or neglect of a resident … [or] indicates an intention to make such a report[.]"

12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. ANALYSIS

Both federal and state law prohibit employers from retaliating against an employee because that employee has engaged in protected conduct. In this case, Ms. Bashaw brings her retaliation claims under Title VII, Ohio Rev. Code Chapter 4112, and Ohio Rev. Code § 3721.24. (Am Compl., ¶¶ 55–62, 70–81.)

To establish a *prima facie* case of retaliation under Title VII without direct evidence of discrimination, Ms. Bashaw must establish that (1) she engaged in protected activity; (2) Majestic Care knew of the exercise of the protected right; (3)

an adverse employment action was subsequently taken against her; and (4) the protected activity is causally connected to the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citation omitted). "Ohio courts employ the same test for claims of retaliation under Ohio Revised Code Chapter 4112." *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 476 (6th Cir. 2012); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) (citations omitted) ("[F]ederal case law interpreting Title VII … is generally applicable to cases involving alleged violations of [Ohio Rev. Code] Chapter 4112."). A substantially similar standard also applies to claims under Ohio Rev. Code § 3721.24. *Dolan v. St. Mary's Home*, 794 N.E.2d 716, 721 (Ohio Ct. App. 2003) ("[T]he employee must show that the activity was protected, that the employer knew about the activity, and that the alleged retaliation followed closely in time to the protected activity.").

The burden to establish a *prima facie* case of retaliation "is not onerous" but rather "is a burden easily met." *Tingle v. Arbors at Hilliard*, No. 2:09-CV-01159, 2011 WL 1532021, at *8 (S.D. Ohio Apr. 21, 2011) (Frost, J.), *aff'd*, 692 F.3d 523 (6th Cir. 2012) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations omitted)). If Ms. Bashaw establishes her *prima facie* case, the burden shifts to Majestic Care to articulate "legitimate, nondiscriminatory reason[s] for its actions[.]" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008); *Dolan*, 794 N.E.2d at 721. If Majestic Care meets its burden, the onus shifts back to Ms. Bashaw to demonstrate that the legitimate reason(s) that

10

Majestic Care offers were in fact merely "pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544; *Dolan*, 794 N.E.2d at 721.

Although Majestic Care argues that Ms. Bashaw cannot establish the elements of her *prima facie* case for her three claims, the Court will assume for purposes of this Opinion that she can because, as detailed below, her claims fail at the pretext stage.

**Ms. Bashaw cannot establish pretext.**

Majestic Care offers four reasons for terminating Ms. Bashaw: (1) Ms. Bashaw told Ms. Nieset that she did not want to return to work; (2) Ms. Bashaw had surreptitiously recorded work conversations and meetings; (3) Ms. Bashaw violated company policies regarding the safe discharge of a resident; and (4) Ms. Bashaw was often tardy or missed work.[5] (Nieset Dep., 71:19–72:10.) The Court finds that these are legitimate, non-retaliatory reasons. *See, e.g., Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015) (employee's insubordination and failure to follow company policies constitute legitimate, non-retaliatory reasons to terminate employment); *Hall v. ITT Auto.*, 362 F. Supp. 2d 952, 959 (N.D. Ohio 2005) (applying Ohio law and finding that "excessive absenteeism" constitutes legitimate, non-discriminatory reason for termination).

---

[5] In addition to these four reasons, Majestic Care also references "concerns" with Ms. Bashaw's overall performance, including "insubordination" and failure to complete tasks. (Mot., PAGEID # 224 (citing Beatrice Dep., 36:3-13); *id.*, PAGEID # 239.) However, Ms. Nieset provided four reasons for Ms. Bashaw's termination when asked during her deposition, and both Ms. Bashaw and Majestic Care dedicate most of their briefings to these four reasons. As such, the Court will also so focus.

Ms. Bashaw now has the burden of demonstrating that Majestic Care's reasons were merely a pretext for unlawful retaliation. A plaintiff can demonstrate pretext by showing "(1) that the [employer's] proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009); *Parker v. Bank One, N.A.*, No. 18573, 2001 WL 303284, at *4 (Ohio Ct. App. Mar. 30, 2001). "A plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (internal quotation marks and citation omitted); *see also Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 798 (S.D. Ohio 2013) (Smith, J.), *aff'd*, 577 F. App'x 544 (6th Cir. 2014) (observing that pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is").

Where, as here, an employer proffers multiple reasons for termination, a plaintiff must "cast substantial doubt on a fair number of them" to show pretext. *Nathan*, 984 F. Supp. 2d at 801–02 (citations omitted). "[T]he issue is qualitative, not quantitative: the court must determine whether the plaintiff has presented sufficient evidence from which a factfinder could conclude that the defendant's

explanation is false, and that discrimination was the real reason. *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 n.4 (1993) ("It is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.")). "When an employer offers more than one independent, legitimate, non-[retaliatory] reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment." *Jones*, 504 F. App'x at 477–78.

Ms. Bashaw challenges Majestic Care's reasons for her termination on several grounds. However, the Court finds that all but one of the reasons were not pretextual, so Majestic Care is entitled to summary judgment.

### 1. Majestic Care's first stated reason is based in fact.

Ms. Bashaw begins by arguing that Majestic Care's first reason for firing her—that she said that she did not want to return to work—is not based in fact. (Resp., PAGEID # 862–66.) This method of establishing pretext requires the plaintiff to show that the facts necessary for the defendant's legitimate, non-retaliatory reason never occurred or were false. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

According to Ms. Bashaw, she "never informed Ms. Nieset that she was uncomfortable returning to work. Instead, she expressed the opposite … Ms. Bashaw informed Ms. Nieset that she did not want to work in the environment she was in[.]" (Resp., PAGEID # 862–63.) A review of the transcript of that conversation

13

arguably supports Ms. Bashaw's recollection. The transcript reveals that Ms. Bashaw told Ms. Nieset that she disliked the working environment and certain other aspects of the facility. (Recording 3 ("I don't want a working environment [like] that[.]").) But she also said that she "hope[d] that things would get better" at the facility and that she loved her job and "care[d] about the residen[ts] [] so deeply." (*Id*.) Thus, with the benefit of a transcript, Ms. Bashaw did not say what Ms. Nieset understood her to say.

However, "[i]f an employer demonstrates an honest belief in its proffered non-[retaliatory] reason for discharging an employee, the employee cannot establish pretext just because that reason is ultimately shown to be incorrect." *Nathan*, 984 F. Supp. 2d at 798 (citation omitted); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707–08 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)) ("'[S]o long as the employer honestly believed in the proffered reason,' an employee cannot prove pretext even if the employer's reason in the end is shown to be 'mistaken, foolish, trivial, or baseless.'"). This "honest belief rule" is relevant at the pretext stage because "if the employer honestly, albeit mistakenly, believes in the non-[retaliatory] reason it relied upon in making its employment decision," then the employer arguably lacks the necessary intent. *Smith*, 155 F.3d at 806.

The Sixth Circuit has adopted a modified version of the honest belief rule that requires employers to establish their reasonable reliance on the particularized facts that were before them at the time the decision was made. *Wright*, 455 F.3d at

707–08 (internal quotation marks and citations omitted). To overcome an employer's invocation of the honest belief rule, a plaintiff must allege more than a dispute over the facts upon which the discharge was based—rather, she must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Nathan*, 984 F. Supp. 2d at 798 (quoting *Braithwaite v. Timken Company*, 258 F.3d 488, 494 (6th Cir. 2001)); *see also Halker v. Bob Evans Farms, Inc.*, No. 2:13-CV-893, 2014 WL 4472651, at *12 (S.D. Ohio Sept. 11, 2014) (Frost, J.) (quoting *Smith*, 155 F.3d at 807) ("An employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'").

Other than the recording that confirms the exact language used, Ms. Bashaw has not pointed to any evidence that Ms. Nieset did not "honestly believe" she did not want to return to work. On the other hand, Ms. Nieset testified that Ms. Bashaw "conveyed … she didn't feel comfortable working in the building" and that "[s]he didn't want to return to the building." (Nieset Dep., 30:2-9, 70:4-13.) Further, during the investigation and prior to Ms. Bashaw's termination, Ms. Nieset became aware of the notes that Mr. Kuhn provided to Ms. Wimberly summarizing his meeting with Ms. Bashaw. (*Id.*, 26:17–29:8.) Mr. Kuhn's notes reflect that Ms. Bashaw told him that she was interviewing for other positions. (Kuhn Notes, PAGEID # 257 ("She told me that if I haven't started job searching, that I should be

like her because she was on her 3rd interview this week."); *see also* Bashaw Dep. I, 42:8-11 ("Q: Okay. As part of this conversation, did you tell Chandler that you were interviewing for other jobs? A. I did.").) Considering these points, it was reasonable for Ms. Nieset to interpret Ms. Bashaw's statements about not wanting to "work in the environment she was in" as confirmation of her unwillingness to work at Majestic Care entirely. Ms. Bashaw has thus failed to show that Ms. Nieset's belief was not honestly held or was "too obvious to be unintentional."

### 2. Majestic Care's second stated reason actually motivated its decision to terminate Ms. Bashaw.

Ms. Bashaw next argues that her surreptitious recordings did not actually motivate Majestic Care's decision to terminate her. (Resp., PAGEID # 861.) This method of proving pretext requires the plaintiff to establish that the weight of the circumstantial evidence makes it more likely than not that the defendant's legitimate, non-retaliatory reason is a pretext. *Manzer*, 29 F.3d at 1084 (emphasis in original) ("In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant."). To make a showing of pretext in this manner, the "plaintiff may not rely simply upon [her] *prima facie* evidence but must, instead, introduce additional evidence" of retaliation. *Id*.

Ms. Bashaw's additional evidence of retaliation is that Majestic Care did not have a specific policy prohibiting her from recording meetings. (Resp., PAGEID # 862.) However, as the Sixth Circuit has recognized, "[w]hether a policy is written

16

or unwritten has minimal probative value on the issue of pretext." *Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991); *see also, e.g., Quintanilla v. AK Tube LLC*, 477 F. Supp. 2d 828, 834 (N.D. Ohio 2007) (unwritten policy insufficient to establish pretext in discriminatory termination case because "the fact that the policy was unwritten does not mean that it is an unfit standard to which to hold employees"); *Davenport v. Big Bros. & Big Sisters of Greater Miami Valley, Inc*., No. 23659, 2010 WL 2225362, at *12 (Ohio Ct. App. June 4, 2010) ("At the time of the recording incident, the agency also lacked a policy prohibiting employees from tape recording staff meetings … This does not mean that [defendant] properly could not reprimand [plaintiff] … once it was discovered that she had taped a meeting without informing anyone.").

Ms. Nieset testified that Ms. Bashaw's recordings raised concerns about confidentiality and privacy. (Nieset Dep., 79:3-15.) During the meetings that she recorded, Ms. Bashaw and others discussed patient care in detail. (*See, e.g.*, Recording 2, *generally*.) No reasonable jury could deem Majestic Care's decision to terminate Ms. Bashaw as so unreasonable to conclude from this that she proved pretext, considering the nature of the business and the privacy concerns for residents. Even when no employee policy forbids such recording, it is not particularly idiosyncratic or questionable that an employee would be prohibited from engaging in such conduct. *See, e.g., Allen v. Highlands Hospital Corp.*, 545 F.3d 387, 397–99 (6th Cir. 2008) (despite fact that hospital did not have written policy governing release of medical records, employer could fire employees for

17

accessing patient's medical records without proper authorization).

Thus, Ms. Bashaw has failed to show that her surreptitious recordings did not actually motivate Majestic Care's decision to terminate her.

### 3. Majestic Care's third stated reason raises a genuine issue of material fact as to pretext.

Ms. Bashaw denies that she mishandled Resident B and invokes the cat's paw theory to argue that Ms. Nieset blindly relied on inaccurate information provided by Mr. Beatrice in deciding to terminate her. (Resp., PAGEID # 863.)

A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Procter Hosp.*, 562 U.S. 411, 415 (2011). "Under these circumstances, the decisionmaker's intent does not matter, and consequently the honesty of the decisionmaker's belief does not matter." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017).

An employer can overcome a cat's paw claim by establishing that the decisionmaker had an informed and honest belief in its proffered non-retaliatory reason for the adverse employment action. *Marshall*, 854 F.3d at 380. "A supervisor who conducts an in-depth and truly independent investigation is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation." *Id*. That evaluation, however, may not "'rel[y] on facts provided by the biased supervisor.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012) (quoting *Staub*, 562 U.S. at 420). Indeed, if the decisionmaker consults with the biased supervisor or another higher-

level employee who has consulted that supervisor, that conduct "would only serve to exacerbate, not purge, the alleged retaliatory taint." *Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F.App'x 685, 697 (6th Cir. 2013).

In this case, Ms. Bashaw has raised a factual dispute as to whether Mr. Beatrice influenced Ms. Nieset's decision to terminate her and whether Ms. Nieset conducted an independent investigation. The record reflects a disagreement as to what Ms. Bashaw told the hospital about Resident B—Ms. Bashaw asserts that she did not refuse Resident B's re-admission, while Majestic Care asserts that she did. (*Compare* Bashaw Dep. I, 72:24–74:13, *with* Beatrice Dep., 102:3-18.)

It does not appear that Ms. Nieset spoke with anyone at Mount Carmel about the incident, nor did she interview any of the employees that Ms. Bashaw indicated were in the room with her when she was on the phone with the hospital. (Nieset Dep., 59:19–61:18.) Indeed, the only person (besides Ms. Bashaw) that Ms. Nieset spoke with as part of her investigation was Mr. Beatrice. (*Id.,* 68:7-14.) Ms. Nieset testified that she did not take any other actions before concluding the investigation and terminating Ms. Bashaw as a result. (*Id.,* 68:15-18.) This is hardly the "in-depth and truly independent investigation" that is required to avoid pretext—to the contrary, it seems as though Ms. Nieset relied almost entirely on "facts provided by" Mr. Beatrice rather than conducting "an independent evaluation of the situation." *Marshall*, 854 F.3d at 380; *Chattman,* 686 F.3d at 348 (quoting *Staub*, 562 U.S. at 420).

Because the Court cannot determine whether Ms. Bashaw did in fact tell

19

Mount Carmel that Majestic Care would not be re-admitting Resident B, and because the record does not show that Ms. Nieset conducted an independent investigation, Ms. Bashaw has demonstrated a genuine issue of material fact as to whether this reason was pretextual.

### 4. Majestic Care's fourth stated reason was sufficient to motivate its termination of Ms. Bashaw.

Finally, Ms. Bashaw argues that her poor attendance and tardiness were not sufficient to motivate her termination, attempting to demonstrate that other employees that had not engaged in protected conduct were not terminated though they engaged in substantially identical conduct. (Resp., PAGEID # 860–61); *see also Manzer*, 29 F.3d at 1084 ("The third showing … consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.").

The only employee Ms. Bashaw specifically identifies for comparison is Jailah Hopson, a former Admissions Director for Majestic Care, who was "often late to the morning meeting" but "was never disciplined or given corrective action for [her] tardiness to the morning meeting." (*Id.*; *see also* Hopson Decl., ¶¶ 6, 8.) Ms. Hopson also was not disciplined when she missed work four or five times without providing advanced notice. (Hopson Decl., ¶¶ 9, 10.) Although Ms. Hopson does not indicate whether her work absences were subsequently excused, in construing the evidence in the light most favorable to Ms. Bashaw, the Court will consider them to be unexcused.

20

None of the evidence to which Ms. Bashaw points establishes that Ms. Hopson was similarly situated to her and engaged in substantially identical conduct but escaped similar discipline. Ms. Hopson's testimony is that she was "often" late (an unquantified number of times) and missed work four to five times during her six months of employment at Majestic Care. (Hopson Decl., ¶¶ 2, 6, 9.) In contrast, Ms. Bashaw was tardy 11 times and had two-and-a-half unexcused absences over the course of approximately six weeks. (Mot., Ex. C, PAGEID # 249.) These metrics render Ms. Hopson an inappropriate comparator for purposes of pretext. *See, e.g.*, *Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 WL 3886405, at *7 (6th Cir. June 8, 2023) (pretext not established where plaintiff "points to no employee with a disciplinary record that demonstrates the employee engaged in 'substantially identical conduct' to her own").

Ms. Bashaw also vaguely references "other interdisciplinary team members" who were late to morning meetings. (Resp., PAGEID # 860–61; Hopson Decl., ¶ 7.) She points to Mr. Beatrice's testimony about his "concerns" with the tardiness of "multiple managers" at the facility and the lack of corrective action. (Resp., PAGEID # 860 (citing Beatrice Dep., 58:7-15).) Again, though, Ms. Bashaw fails to provide any detail about the extent to which these other managers were late or absent. *See Santiago*, 2023 WL 3886405, at *7 (pretext not established where plaintiff did not offer any examples of "individual[s] with attendance policy violations as severe as her own in addition to their performance violations.").

Therefore, Ms. Bashaw's evidence does not undermine Majestic Care's

proffered reason for her termination, and her attempt to establish pretext through this method is unavailing.

## V.      CONCLUSION

Although one of Majestic Care's reasons for terminating Ms. Bashaw presents a jury question, the other three reasons—Ms. Bashaw's surreptitious recording of meetings, her attendance issues, and Majestic Care's honest belief that she no longer wanted to work there—were legitimate and non-retaliatory. That there remains a genuine issue of material fact with respect to one reason does not impede Majestic Care's credibility seriously enough for the Court to rationally disbelieve the remaining three proffered reasons. In other words, Ms. Bashaw has failed to "cast substantial doubt" on Majestic Care's reasons for terminating her.

Accordingly, Majestic Care's Motion for Summary Judgment (ECF No. 21) is **GRANTED**.

**IT IS SO ORDERED.**

<u>/s/ Sarah D. Morrison</u>
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**